Good morning. We have five cases on the calendar this morning. Four patent cases and a government employee case. The latter has been submitted on the briefs and will not be argued. First two cases which have been combined and each side has 20 minutes. Eidos Communications versus Skype, 2014, 1658 and 1660. Mr. Nissen, good morning. May it please the court. The two main issues in these two appeals is the meaning of the word initial in the 744 patent and origination address in the 779 patent. Turning to the 744 patent first, the ordinary meaning of initial is happening or being at the very beginning, first. Thus, Eidos below argued that controlling initial transmission means controlling the first transmission from the sender's origination address. It does not include exercising control or a subsequent retransmission of that message at some other point in the system. The board, however, ignored the plain meaning of initial. Instead, the board construed controlling initial transmission to be, quote, includes controlling the transmission of a voice message from a voice message system 10 or substantially similar voice message system 50 to a recipient system, the voice message system 10 or substantially similar voice message system 50, being a component that stores message data and instructions and is located remote from the sender's system. There are several problems with that definition. First, you note that they repeatedly refer to the fact that voice message... That is correct, Your Honor. There's one slight wrinkle in this case. The two patents, both have patent term extension, and the 779 actually expires on July 3rd based on the unpublished Facebook opinion from last September. Word decision to come out after that point with an expired patent, according to Facebook, you should use the Phillips standard. Now, we're not sure there's any particular difference between those two in terms of this case, and it's also somewhat weird in the posture of this case, but that's what it is. You raise it just to entertain us. I want to be accurate, because technically after July 3rd for the one patent... But the answer to my question is no, you don't dispute the broadest reasonable interpretation. That is correct. And the 744 is not the one expiring? It expires April of next year. Its patent term extension was longer. You'll notice that the board several times stated that voice message system 10 is substantially similar to voice message system 50. That was a mistake that they made in their order below. In their order below... Can I ask you one question about the specification? I'm sorry for not knowing the answer to this, but does the specification talk about systems, including prior art systems, that would try to reach the recipient more than once? I'm sorry, Your Honor. I don't believe so. So the idea that... Here's what I'm thinking. If there would be systems that would try once, the initial transmission as being the first effort to reach the recipient, as opposed to the second effort to reach the recipient, as opposed to hops on a trip from origin to recipient, where the initial is picking out the earlier legs rather than the later legs. Well, I would respond in a couple of ways to that, Your Honor. First off, when you talk about subsequent transmissions in the prior art, you actually had to get a dedicated voice circuit to go off hook, to reach Pappy or what have you, and those are limited resources, and if the phone is busy, you've tied up a limited resource for no reason. But secondly, if you look at Figure 3, I'm going to talk about it later, but I'll jump to it. But is what you just described, in fact, an example of what at least I was trying to describe, namely a system in which you try to get to the recipient, it's busy, you have to try again? Yes, but I will say, I will admit that even with Pappy... Let me step back from Pappy. Yes, keep in mind, this is a voicemail message system in general. Now certainly the user can program that I don't want to receive voice messages... Or it can be full. The voicemail box can be full and maybe it gets emptied out. Right. It would certainly be the case that... Excuse me. Once you have a circuit, if you keep sending it, you're just tying up that circuit longer, but the point of this invention is not to have a circuit in the first place, not to be sending a message on that's going to be blocked. That if the phone is busy, you don't send a message anywhere. And that's the whole point of this invention. Or if the end user doesn't want to receive a message from me, for example, instead of sending it all the way to the end, tying up system resources, this system, by controlling the initial transmission, stops that from happening. So I think what you're saying is, yes, if you tried five times, that would be more efficient still, but the point of this system is you wouldn't try five times. You wouldn't even try once because the VMS on the sender side knows what the user wants, what the recipient wants, and so he doesn't tie up those resources. The board's construction, like I said, said the VMS 10 and 50 are substantially similar. They are not. They are very separate and different inventions. What was substantially similar was the handsets used to access, and in both cases, the parties agreed, it's just a dumb handset, DTMF, like phones have been for 50 years. In fact, in the response period, the board backed off from that. In their definition, they lift out anything about substantially similar, and they even admit that Figure 1 and Figure 3 are not substantially similar because the 744 patent describes a process specific to it. Their whole basis was they wanted to take the centralized system of Figure 1, and which we can see is anticipated by Pepe, and say, well, since Figure 3 is the same as Figure 1, we're done. And that's why they say that the, in their definition, that the voice message system is located remote from the sender system. It's not in Figure 3. During prosecution, we added the phrase initial, excuse me, the word initial. The board, however, says we added initial transmission. That's just incorrect. If we added initial transition, then it would have said controlling a nothing. That wasn't what it said. It said controlling a transmission. During prosecution, we had raised against us, in particular, Arbel. It's in the appendix A7378. Arbel Figure 1 looks a lot like Pepe Figure 1. You have a phone over here going to the public switch network, into the Arbel invention. The Arbel invention does stuff to the call based on what the recipient wants done. To get over that, we added the word initial. Now, one of the interesting things about the board's construction... What did you add it to? Transmission. Controlling a transmission to controlling an initial transmission. So transmission was already there. Transmission was already there. We added initial. All right. Once again, their definition doesn't change whether initial is there or not. Taking out the stuff about System 50, taking out initial. Controlling a transmission, quote, includes controlling the transmission of voice message from a voice message system. The voice message system being a component that stores message data and instruction and is located remote from the sender's system. Nothing in their definition changes. But it's not proper to treat words in a claim as a purpose, especially when that word in particular was used to overcome the prior art. On page 48 of either of our briefs, it has Figure 1 and Figure 3 from the pack. Now, if you look at Figure 3, it says in the specification at column 7, line 25, user X speaks into a telephone, 56, to create or originate for user Y a voice message from which voice message system 50 generates and stores voice message data. What this says is user X goes off hook and then says, honey, I'm coming. I'm late. Maybe have a three-minute message, three-second message, whatever it is. And that raw message gets sent to voice message system 50, which according to the specification, generates and stores the voice message data, which includes both the body of the message, where it's going to, and then one of the questions is how is it routed? At that point, if it has the instructions from the recipient, it can use those to decide how to route it. Or the specification shows and all through Figure 9 that it can send a message to voice message system 52 and get what that person wants. And 58 may want, may not want calls from me, might say block the call. If so, that message that again was just generated and stored in 50 gets blocked. That is controlling the initial transmission of that message. It might be sent on to 58 if 58 wants it and that's fine. Coming out of 50 is still controlling the initial transmission. Another place it could go is 58, excuse me, the phone could have forwarded his phone to somewhere else, even off their network. In that case, if it goes to the voice message system, up to the network interface device and then into the public switch network, including it could go, the same Figure 1 from Pepe, it could go into the PCI of Pepe. There's absolutely nothing stopping. But Pepe is not controlling the initial transmission. It's gotten the initial transmission. Now, subsequent retransmissions, it can do whatever it wants. But it cannot control the initial transmission. And nothing in Pepe can control the initial transmission. That is why adding initial got overarched. Your view of the initial transmission then is the transmission from user X to 50, voice message system, right? No, Your Honor, it's from 50, in the case of this, to 60. Because the specification, again, says that user X creates a voice message, but then, which is the raw data of the voice, but then, again, Column 7, voice message system 50 generates and stores the voice message data, what the patent refers to as the electronic... Excuse me, Your Honor. The patent refers to that as the initial transmission of the electronic message data. And that is created by 50. And 50 is what has control of that. And in the Pepe system, it does not. Because the PTO, the board, read initial out of the claim, its construction is incorrect, and we would ask for this claim to be remanded. They didn't read it out of the claim. They just read it differently than you do. Well, Your Honor, I would argue they read initial transmission and transmission to be the same. And if initial transmission and transmission are the same, and we add initial, I would argue they read it out. Perhaps I'm wrong, but that's my belief. Regarding the 779 patent, many of the arguments are the same, and I'm not going to waste the Court's time by repeating them. But there are a couple of points I want to make about the 779 patent. Can I just ask on that? Is it right that there are two independent grounds on the 779? One is the data origination clause, and the other is the processing clause?  Exactly. And each one would independently support the board, even if the other one were wrong, right? Yes, that would be correct. On the 779, referring to the first issue you just raised, one, the board gave no construction of these claims below at all. The first time they actually construed these claim terms is in the response brief. In the response brief, they say, quote, This argument is wrong for two reasons. First, prior to transmission does not mean prior to reception. If I told my wife, I'll take the garbage out before I mail this letter to my mother. Three hours later, I'm watching television, and she said, Oh, my mother hasn't received the letter yet, so I haven't mailed it yet. That's not how you read prior to transmission versus prior to reception. They're very different things. Prior to transmission means what it said. Before it's transmitted, not before it's received. That's the first error. The second is that this reads out of the... Excuse me. The second error is the construction for origination address of sender. It was above, but as was true for initial, we added this to overcome prior art, and you can read their construction and take that term out, and nothing changes. I'll read it. The claim's temporal limitation prior to transmitting the digitized voice data is satisfied so long as the data has not reached the recipient. Nothing changed. Prior to origination address of the sender, the recipient is a nullity. That cannot be correct. It's also true that the prosecution history is essential. Forget about essential. It's actually devoid of explanation of what work that amendment was supposed to be doing. I would prefer a more robust prosecution history, yes, Your Honor, but I will say the prosecution history specifically says ARBEL in combination with another reference makes this obvious, which we added initial, we added origination address, and it was no longer obvious. And if you look at Figure 1 of ARBEL, I mean, that's what it is. But it is true. It's not a robust prosecution history. Mr. Nissen, you wanted to save a good bit of time for rebuttal.  I appreciate it, Your Honor. The board says that origination address refers to the telephone which is called origination. This is not the same as the sender's network subsystem, which is downstream of the sender's telethon. Again, that is wrong. It wouldn't cover the land, which is a perverted embodiment. It's also wrong because, as I said previously, it says that user X speaks in telephone 56, creator originate for user Y, from which voice message system 50 generates and stores voice message data. If it's downstream, it has to be routed there. So that has to be incorrect. Just real briefly, on the second argument, they say that prior to doesn't go to both limitations. It only goes to the limitation prior to transmitting the digitized voice data. The problem with that is you have to read those in context, read them together. Prior to transmitting the digitized voice data, obtaining recipient transmission instruction over the computer network, processing the digitized voice data, and according to the recipient transmission instruction. The first limitation I read refers to prior to transmitting digitized voice data, the second processing the digitized voice data. There is no fair reading that that is not the same digitized voice data. It talks about obtaining recipient transmission instruction in the first one. The second one, recipient transmission instruction, those are the same thing. They have to happen at the same time. I will retain them and remain in my copyright book. We will hold it for you. Mr. Natal for the PTO. Your Honor, may it please the Court. The patents in this case claim very similar inventions directed to controlling the transmission of a voice message between a sender and a recipient. The prior art, however, the Pepe reference, already discloses controlling a voice message in an intermediate location in between the sender and the recipient. Speak up, please. I'm sorry. In order to overcome the prior art, IDOS attempts to reinterpret its claims to require controlling the voice message at an earlier location, at either a sender's voice message subsystem in the 779 patent or at the telephone itself in the 744 patent. The difficulty with this position, though, is that the claims simply do not state those terms. What, in your view, does the word initial mean? And, relatedly, what is the minimum content of that word that made the addition of that word by amendment significant enough to change a rejection into an allowance? It's an excellent question, Your Honor, and I'm afraid I don't have an answer. The board and the examiner never looked into that particular issue. I can speculate. Maybe it could be construed to regulate repeated calls to the same person. In some of the systems, also, a smaller message is made, for example, to the processing system before the bulk of the voice message data is sent in order to avoid sending the bulk of that data if it's going to be blocked. Were the bases of the pre-amendment rejections, did those bases have, that is the prior art bases, did they discuss the kinds of things that you just mentioned which might then be distinguished by the addition of the word initial in one case, the addition of the, whatever the phrase is, from the origination address or something in the other case? I certainly found no written explanation, but then there's some gap between finding a written explanation and saying this was completely insignificant. We know it was not completely insignificant because a rejection was changed to an allowance, so the question is what can one infer from the prior art bases of the rejection suddenly changed into an allowance, and maybe one can infer something, maybe one can't, but on the other hand, giving this term zero content is a little troubling. You're right, Your Honor, and I'd be much happier if I could come to this court offering some explanation of what the examiner and the applicant understood when those terms were added, but unfortunately the prosecution is simply devoid of explanation. This is a case where applicants often use the strategy of saying as little as possible during prosecution in order to avoid being subject to any estoppel. To get back to my question, which I then stepped on by elaborating, does the prior art that was the basis for the rejection in either case talk about any basis or show any basis, admittedly not discussed, that either of the two additions would in fact overcome? I don't know, Your Honor. The prior art simply wasn't analyzed either before the board in this case or even in the briefing in this court. All we have is a prosecution record that, again, the office would analogize this case to this court's decision in the Three Improperties case from 2013, where the court recognized, yes, claim terms were added in order to overcome prior art. However, because nothing was said to elucidate how the examiner or the applicant understood those claim terms, it simply doesn't amount to the kind of clear disavowal that would allow reading in a limitation. Right, but it seems to me we have kind of a double problem here. It's one thing to say we can actually give, we can understand some content of the term from the claim itself and we don't find anything in the prosecution history that changes that. It seems to me we have, as I say, a double problem. It's not clear what this term initial means at all. Let's focus actually on that term, the initial one, the 744, since that's more challenging, I think. Yes, Your Honor. In all of the embodiments of the invention, the message is traveled in segments. They never go straight from the sender to the recipient. In some embodiments, there's one intermediate location that divides the path into two segments. In the other embodiment, Figure 3, there's actually two intermediate locations where some processing occurs. So the term initial, when you say, and the claim only refers to initial in terms of where the segment ultimately ends with the recipient of the call, but the claim never states where that segment begins. The only thing we have before us in the claim is processing and receiving instructions for controlling the initial transmission to the recipient. The problem that Judge Taranto has just pointed to is a not unfamiliar one that we have and perhaps the solicitor's office would be interested in. We often see cases where there's been an amendment in the record which overcame some prior art with no explanation as to why and how that particular amendment worked, and we are then called upon to figure out what that amendment is really all about. I don't know whether that record process can be improved on, but perhaps the solicitor's office would want to think about that. I understand, Your Honor. This would be a very simple case if during either the application of the prosecution... The 779 claim requires processing at the sender's network subsystem and that the 744 representative claim requires processing at the telephone. This would be a very simple case if the claims had simply been amended at some point to state processing at the sender's network subsystem or at the telephone. The sender's network subsystem, for example, is clearly identified in the specification. In Figure 3 it's even given an item number, item 61. The fact that this very obvious way of identifying where the processing was claimed to occur wasn't used is to some extent the dog that didn't bark. The fact that it's not stated when it's clearly identified there's an obvious way to do it would tend to lead the public away from assuming that it was claimed and in any event creates the very type of ambiguity that the... No, that's not how the... That's not how the examiner on the board analyzed it so I'm not prepared to analyze it in those terms. I assume the MPEP states that the examiner may indicate why an amendment overcame the rejection, but that that's permissive. What percent of the cases would you estimate that where an amendment overcomes a rejection there is such an explanation? I'm afraid I don't have a basis on which to even speculate about the numbers there, Your Honor. That's a good question. And to reiterate our grounds for why we believe the board's construction is reasonable, the construction being urged here not only avoids using very obvious ways that processing at these locations could have been claimed, the constructions also exclude preferred embodiments in the case of the... Can I just add, on the... The point you just made about processing, does that apply? We have three claimed construction issues, two in the 779 and one in the 744. Does that point apply just to the processing point in the 779? Well, yes, in the sense that if IDOS wants to claim processing at the sender's network subsystem in the 779, there's no apparent reason why it couldn't have simply stated that. Right, so in the 779, there's a quite obvious linguistic alternative for the processing term. Do you have a counterpart point for the other two claimed construction issues, one in the 779, one in the 744, the origination address and the... In the 779, if just one of the steps had been amended to state processing at the sender's network subsystem, that would have dealt with both of the issues in the 779. In the 744, again, the sender's telephone is clearly identified. If IDOS sought to claim processing these voice messages at the location of the sender's telephone, there's no apparent reason why it couldn't have simply claimed that. And the contrary interpretation being urged, again, would exclude preferred embodiments for no apparent reason. This isn't a case where, for example, the claims use some terminology that's unique to one of the embodiments that would lead the public to understand only that embodiment was being claimed. So this is a case that invokes the general rule that a claim construction that excludes a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support. That support is simply lacking here. In the case of the 779, for example, if the claim is construed this way, because the terms from an origination address to the sender are used in all of the independent claims, you're effectively excluding one of only two preferred embodiments from all 75 claims of the patent. When you consider how these claims would be understood by the public, picking up and reading these claims in view of the specification, the fact that, again, processing at the sender's network subsystem is never claimed. In fact, there's no temporal limitation ever claimed with respect to processing. What about the 744? Is there a similar wholesale exclusion of a major written description embodiment? Yes, Your Honor. In the 744, Eidos has conceded that figure one, the first of the two embodiments, is excluded, and as a practical matter, figure three is also excluded. Eidos contends that figure three is not... Excluded by their interpretation. By their interpretation, yes. Eidos contends that figure three is not excluded because the telephone is co-located with the voice message system, but the specification simply doesn't support this interpretation. To address this point, it's best to look at the actual drawings. These are at page 23 of the Director's Brief or at pages 824 and 834 of the Record. Are we looking at figures one and three? One and three, yes. In both of these figures, you see a telephone that's a distinct item connected to a voice message system. They're both portrayed as separate items. In the case of figure one, or for both, frankly, Eidos concedes that the processing actually occurs at the voice message system. What occurred? The processing of the voice message instructions occurs at the voice message system, not at the telephone. Eidos also concedes that it's excluding figure one and its interpretation of a 744, that in that system, the telephone is not the same thing as the voice message system, but it contends that it's only claiming figure three and that in figure three, the telephone 56 and the voice message system 50 or subsystem 61 are co-located with the telephone. And there are multiple reasons. As an initial matter, even if this were portrayed in these drawings, even if you did have this co-location, Eidos' argument simply amounts to an effect to read limitations from the embodiments into the claims, which is itself improper. But in this case, the limitation being urged doesn't even exist in the figures. Just a cursory review of figures one and three reveals a very similar relationship between the phone and the voice message system, that they're separate items and not co-located to a degree that they assume a common identity. Eidos' argument essentially amounts to, yeah, when we refer to the voice message system, because the telephone's in the same place, people would know we mean the telephone. I take it our job is to determine whether the PTAB's construction, under its broadest reasonable interpretation policy, is reasonable. Is that your understanding? That seems to be theirs as well. Yes, Your Honor. How do you suppose we would go about doing that? Beginning with the claims in view of the specification, and again, what you're being urged by Eidos to adopt is limitations that aren't stated in the claims, that exclude preferred embodiments, and in the case of the 744 patent, that attempt to draw a distinction between figures 1 and 3, and the relationship between the phone and the voice message system that simply isn't present. That might make their interpretation unreasonable, but why is yours reasonable? Ours is reasonable because it rejects a limitation that isn't clearly stated, that's at best ambiguous. We contend that it's even more than just ambiguous as to whether these limitations are present, that the correct interpretation, the only reasonable interpretation, is that these limitations aren't present. Again, because embodiments are excluded, because distinctions are drawn between these figures 1 and 3. With the 744 patent, for example, Eidos' entire argument turns on this notion of co-location, but the specification itself notes that the telephone and the voice message system can be located at quite a distance from another, even across international boundaries. That point is made only with respect to figure 1, but elsewhere the specification notes that the telephone in figures 1 and 3 provides substantially the same access to the voice message system as it does in figure 1, that the relationship between the phone and the voice message system is the same in both of these. So, again, a competitor of the public viewing this patent would reasonably understand that the telephone and the voice message system aren't co-located in either of these. There certainly isn't the type of pervasive co-location that would lead one to conclude that there's an identity between the phone and the voice message system such that when you refer to the voice message system you effectively mean the phone as well. That's essentially the gist of Eidos' argument, and, again, it's just clearly contrary to these drawings, clearly contrary to the description of these systems being at quite a distance from one another. And, again, there's simply no support for this in the claims. There's simply no ambiguous term that's being construed to require that even if you did have this pervasive understanding or depiction in the embodiments, there's no vessel into which that could be read to nothing that's being interpreted as a definition or anything like that. There's nothing further. Thank you, Mr. Mattel. You're welcome. Mr. Nissen has some rebuttal time. Yes, Your Honor. Three minutes and 20 seconds. Well, we certainly agree with the Board on one thing. They've read initially all the claims. They just said it. Now, you ask them specifically, what's the difference between initial transmission and transmission? The answer is, I can't answer that. We have an initial get-over-art. They have ignored it. I said I wish the record... Can I ask a... This is not going to be a very well-formed question, but it's sort of a version, I guess, of what Judge Plager was pointing out. Suppose one has a case in which the examiner rejects and you go to the Board and say, the ground that we stand on is the following construction, and the Board says, that can't be right. Should that not be enough to support a rejection because you haven't provided a well-supported, publicly understandable claim construction so that either there's a broader one under which you lose or presumably you would have argued it, or it's indefinite. In either event, this patent should not survive. Your Honor, first off, I disagree with this case, but I understand you're asking hypothetical. My answer is, it's their job to provide the broadest reasonable interpretation. If they can't do it, they might say the patent's indefinite. We tried to find an interpretation, and it's indefinite. But they didn't do that here. If neither party can come up with an interpretation, then the claim might be indefinite, and we would have argued different things for indefiniteness. But that's what they had to do. They can't just throw out a term. Well, there was a time when we had a rule that said if anybody could figure out what these claims mean, then the claims are okay. And we, of course, were anybody. But that was a different problem. The problem here is they're looking at this and they're saying, well, we have to apply the broadest reasonable interpretation. It looks like it could be indefinite. But on the other hand, maybe it's possible with the broadest reasonable interpretation to make some sense out of what these claims are about. What's wrong with their effort to do that? Well, I think what's wrong with that is that we never got an opportunity to argue why it wasn't indefinite, because nobody's ever raised that. You don't have to raise it. All you have to do is read it. I would disagree, Your Honor. But we add initial. Arbol is very similar. Arbol Figure 1, which is in the record, is very similar to Pepe Figure 1. One thing they say is that there's nothing that would show that it's co-located. Figure 1 says you have to call from other countries.  Figure 3, the patent says, is local systems, land, and lands. Lands are groups of local systems. A land, to repeat the definition, a system that links together electronic office equipment such as computers and forms a network within an office or a building. We don't think there's any question that in Figure 3 it's co-located. Also, in describing Figure 3, to repeat myself quickly, that the user creates a voice message from which Voice Message System 50 generates and stores the voice message data. The voice message data is what is processed. If you read Column 9, you'll see how it decides, before it ever sends it on to the network interface device, whether to block it, whether to allow it, whether to reroute it. That is controlling the initial transmission. That is a plain ordering of initials, and we'd ask that it be reversed. Thank you, Mr. Nissen. We'll take the case on revising it.